**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SLOAN VALVE COMPANY, a Delaware corporation, | ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 10-cv-204 |
| v. | ) ) | |
| | ) | Honorable Amy J. St. Eve |
| ZURN INDUSTRIES, INC., a Delaware corporation, and ZURN INDUSTRIES, LLC, a Delaware limited liability company, | ) ) ) | |
| | ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiff Sloan Valve Company's ("Sloan") renewed motion for sanctions against Defendants Zurn Industries, Inc. and Zurn Industries, LLC (collectively, "Zurn") for failure to make discovery and comply with the Magistrate Judge's orders. Sloan argues that Zurn has, among other things, failed to search adequately for and produce responsive documents and has failed to timely instruct its employees to preserve relevant evidence. Sloan asks the Court to enter an order finding that Zurn is in default with respect to issues of liability and setting a schedule for damages discovery, expert discovery on damages, and trial on damages and equitable relief. In the alternative, Sloan requests that the Court find, as an irrebuttable fact, that Zurn copied Sloan's dual flush product. Sloan also requests attorney's fees for its motion. For the following reasons, the Court grants Sloan's motion in part and denies it in part.

# BACKGROUND[1]

Sloan filed this lawsuit on January 13, 2010, alleging that Zurn had appropriated its "dual mode flush valve invention," thereby infringing U.S. Patent No. 7,607,635, entitled "Flush Valve Handle Assembly Providing Dual Mode Operation" and the corresponding U.S. Patent Application Publication No. 2006/0151729. (R. 1, Compl.[2]) Zurn has asserted counterclaims for invalidity, non-infringement, and inequitable conduct. (R. 287, First Am. Answer and Counterclaim.)

This is one of many discovery motions that Sloan has filed in this case. *See* R. 63, 86, 110 & 234. Sloan filed a motion to compel discovery and award sanctions on July 23, 2010, arguing that Zurn failed to produce documents that Sloan had requested. (R. 86.) Because of the small number of documents that Zurn had produced as compared to Sloan and Sloan's perceived gaps in Zurn's production, Sloan suspected that Zurn had not conducted an adequate document search. As a remedy, Sloan sought an order compelling Zurn to, among other things, "conduct a document search that is in compliance with the Federal Rules of Civil Procedure and provide documents responsive to Sloan's Requests for Production Nos. 1-48." (R. 87, Sloan's Mem. of Law in Supp. of July 23 Mot. at 15.)

The Court referred the matter to the assigned Magistrate Judge, who, on August 16, 2010, denied Sloan's motion as moot due to an agreement of the parties. (R. 107, 108.) On the same date, the Magistrate Judge entered an agreed order (the "August 16 Order"), requiring Zurn to

---

[1] For a discussion of the underlying factual allegations involved in this case, *see Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10-cv-204, 2012 WL 1237744 (N.D. Ill. Apr. 12, 2012) and 2012 WL 1108129 (N.D. Ill. Apr. 1, 2012).

[2] Sloan filed an Amended Complaint on November 29, 2011. (R. 197.)

deliver a letter to Sloan by August 27, 2010 setting "forth in detail a description of how Zurn went about its search for documents responsive to Plaintiff's Request for Production Nos. 1 through 48, including electronic searching for documents." (R. 108, Aug. 16 Order ¶ 10.) The August 16 Order also required Zurn to supplement its production and to "certify by written letter to Sloan that Zurn has not withheld any documents located through the searches that are responsive to Sloan's document requests." (*Id*. ¶ 11.) On August 27, 2010, Zurn sent a letter to Sloan, certifying that it "can confirm that it has not withheld any non-privileged documents that are responsive to Sloan's document requests." (R. 231-1, Zurn Aug. 27, 2010 Ltr. at 3.) Zurn also described its document collection efforts in the letter, albeit with little substantive detail. Specifically, Zurn stated the following:

> Zurn identified its current and former engineers with varying levels of involvement in the testing, development, and marketing of Zurn's manual dual-flush handles, including the accused products. With the help of Zurn's [information technology or "IT"] personnel, we secured digital copies of the email records, hard drives, and networked storage drives affiliated with each employee. Through this process, we collected approximately 25,000 unique documents consisting of approximately 200,000 total pages. Using a focused, iterative approach, we developed and applied a set of comprehensive search terms to the document set that eventually narrowed the scope of documents to the production set of April 28, 2010. On May 21, 2010, pursuant to Sloan's request, we supplemented Zurn's initial document production with email attachments not produced in the initial production set, along with an Excel spreadsheet correlating the document control numbers of both productions.

> As discovery progressed, we continued to refine our search to include specific terms such as "IAPMO," "ASME," "Greenspec," etc. In response to Sloan's inquiries, we also ran additional queries against the original documents set, but did not identify any additional responsive documents beyond those already produced. Zurn's supplemental productions of July 9 and July 26, 2010 included additional test data, technical drawings, and prior art documents compiled from a comprehensive onsite inspection of Zurn's paper and networked archives at both its Erie, PA and Sanford, NC facilities. Finally, Zurn's productions of August 26-27, 2010 included product information on Zurn's flush valve handles incorporating a brass retainer, native files corresponding to CAD files previously

3

produced, and sales and ordering information for Zurn's Z6003-AV-DF product as well as its flush handle products having a brass retainer.

(*Id.* at 2-3.)

On September 20, 2010, Sloan filed a motion for sanctions against Zurn for failure to comply with the August 16, 2010 Order. (R. 110, Sept. 20 Mot.) On October 5, 2010, the parties appeared before the Magistrate Judge, who determined that Zurn's August 27 letter did not provide sufficient detail about Zurn's searches.[3] (R. 140, Oct. 5 Hr'g Tr. 35:12-13.) Although the Magistrate Judge denied Sloan's motion with respect to the particular relief that Sloan sought, he ordered Zurn to supplement its description of its searches for responsive documents with specific information, including (a) the identities and credentials of the IT personnel who assisted in developing and executing any searches for [electronically stored information or "ESI"], or who processed the ESI obtained through those searches; (b) the custodians whose ESI was searched, and their job titles within Zurn; (c) the servers that were searched; (d) the search terms or other filters used in conducting the searches; (e) the steps used to process documents identified through the searches; (f) the steps taken to preserve and produce metadata; and (g) the searches of files held by the Webb law firm to locate responsive ESI and hard copy documents not in the files of Zurn. (R. 135, Oct. 5, 2010 Order.) The Magistrate Judge also ordered Zurn to produce one or more Federal Rule of Civil Procedure ("Rule") 30(b)(6) witnesses to testify regarding Zurn's document searches and preservation efforts. (*Id.*)

---

[3] The Magistrate Judge also expressed frustration, which this Court echoes, that the parties could not agree to exchange search terms at the outset of the litigation. (R. 140, Oct. 5 Hr'g Tr. 35:14-36:12.) Had the parties exchanged search terms, or better yet, agreed to search terms and the temporal scope of their respective searches, it would have saved significant time and resources.

On October 19, 2010, Zurn served on Sloan its "Supplemental Description of Search for Responsive Documents" (the "Supplemental Description") pursuant to the Magistrate Judge's October 5, 2010 Order. (R. 231-8.) In it, Zurn explained in detail the measures it took to locate responsive documents. Sloan thereafter deposed the following Rule 30(b)(6) witnesses in November 2010:

- Michael A. Funari (Zurn's engineering manager who oversaw document collection at Zurn's Sanford, North Carolina facility);

- Chris Rodriguez (Zurn's Computer Assisted Design ("CAD") supervisor, who generated a listing of CAD drawings that Zurn's counsel used to identify responsive documents);

- James Hasselman (Zurn's IT manager, who generated directory listings that Zurn's counsel used to identify responsive documents);

- Steven Johnston (Zurn's outside counsel who led the search for responsive documents); and

- Cory Ranallo (employee of Zurn's third party document processing vendor, CLiCKs).

On December 16, 2010, the Court granted Zurn's motion to stay the case pending the United States Patent and Trademark Office's reexamination of the patent at issue. (R. 157, Dec. 16, 2010 Order.) Upon Sloan's motion, the Court reopened the case and lifted the stay on November 10, 2011. (R. 192, Nov. 10, 2011 Order.) After the parties had an opportunity to engage in further discovery, Sloan filed its renewed motion for sanctions on January 23, 2012. (R. 223.) On April 20, 2012, after the parties had fully briefed Sloan's renewed motion, Zurn filed supplemental evidence, consisting of two declarations, with the Court. (R. 299, 300.) Three days later, on April 23, 2012, Zurn produced approximately 2,900 additional documents to Sloan. Sloan filed a response to Zurn's supplemental submission on April 30, 2012. (R. 303.)

5

## LEGAL STANDARD

Courts have discretion in determining whether to impose sanctions for discovery violations. *See Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 190 (7th Cir. 2011); *see also Danis v. USN Comm'cns,* No. 98 C 7482, 2000 WL 1694325, at *31 (N.D. Ill. Oct. 20, 2000) ("A court is given broad discretion to choose the appropriate sanction for a discovery violation given the unique factual circumstances of every case."). The Seventh Circuit has instructed that "[a]lthough there is no requirement that the district court select the 'least drastic' sanction, district courts should only impose sanctions that are 'proportionate to the circumstances surrounding a party's failure to comply with discovery rules.'" *Rice v. City of Chicago*, 333 F.3d 780, 784 (7th Cir. 2003) (quoting *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996)); *see also Wade v. Soo Line R.R. Corp*., 500 F.3d 559, 564 (7th Cir. 2007) ("The punishment should fit the crime, so fees and fines - which can be scaled as appropriate - often are the best sanctions.") (citations omitted). Sanctions are intended generally to "ameliorate the prejudice caused to an innocent party by a discovery violation," "punish the party who violates his or her obligations," and "to deter others from committing like violations." *Danis*, 2000 WL 1694325, at *31 (citing cases).

Rule 37(b)(2)(A) provides that a Court may impose sanctions on a party who fails to obey a discovery order, including striking pleadings in whole or in part, staying further proceedings until the order is obeyed, dismissing the action in whole or in part, directing that the matters embraced in the order be taken as established for purposes of the action, prohibiting the disobedient party from supporting or opposing designated claims or defenses, rendering a default judgment, and treating the party's failure to comply as a contempt of court. Fed. R. Civ. P.

37(b)(2)(A)(i)-(vii).  Further, pursuant to Rule 37(b)(2)(C), a court must order the disobedient

party, its attorney, or both to pay the reasonable expenses, including attorney's fees, caused by

the failure "unless the failure was substantially justified or other circumstances make an award of

expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

## ANALYSIS

This case involves Zurn's alleged infringement of Sloan's patent for a dual flush toilet

handle, which provides two different flush volumes depending on which way the user pushes the

handle.  According to Sloan, Zurn has failed to produce information that would establish, among

other things, the extent to which Zurn copied Sloan's dual flush handle after learning about it

sometime in the middle of 2005.  Sloan asserts that such information is relevant to both Sloan's

claim of willful infringement of its patent and Zurn's counterclaim that the patent is invalid due

to obviousness.  Documents that Zurn has produced, Sloan argues, "strongly suggest that Zurn

copied Sloan's product," but Sloan suspects that Zurn is withholding additional documents that

would support Sloan's position.

Sloan identifies six ways in which Zurn has failed to comply with its discovery

obligations: (1) Zurn failed to conduct an adequate search of its CAD database; (2) Zurn's search

of the K:Drive (shared drive) was flawed; (3) Zurn's search of the J:Drive was flawed; (4) Zurn

failed to search for critical ESI generated by its part-replicating machine ("CCM Machine");

(5) Zurn produced Rule 30(b)(6) witnesses who did not adequately prepare for their testimony;

and (6) Zurn failed to timely issue a document preservation notice to its employees.  The Court

addresses each of these arguments below.

Although sanctions in some form against Zurn are appropriate based on Zurn's problematic conduct, as explained below, Zurn's conduct, based on the record, does not rise to a level that justifies the harsh sanctions of a default judgment or an adverse inference or finding. *See In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006) ("When ordering the sanctions of default judgment . . . under Rule 37(b), the court must find that the party against whom these sanctions are imposed displayed willfulness, bad faith or fault.") (citing *Maynard v. Nygren*, 332 F.3d 462, 467-68 (7th Cir. 2003) and *In re Golant*, 239 F.3d 931, 936 (7th Cir. 2001)); *see also Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (holding that an adverse inference instruction for failure to preserve documents requires a showing that the party destroyed the documents in bad faith). Instead, as discussed below, the Court reopens discovery and orders Zurn to conduct additional searches and provide additional information consistent with this Order. The Court also imposes monetary sanctions against Zurn for its continual failure to comply with its discovery obligations. *See Rice*, 333 F.3d at 783 (court should impose sanctions that are proportionate to the circumstances surrounding the party's failure to comply with discovery obligations).

## I.    CAD Drawings and Database

### A.    Zurn's drawings

Zurn uses two relevant types of shop drawings that show how a product is to be manufactured–assembly drawings and detail drawings. (R. 233-7, Bauer 11/18/2010 Dep. Tr. 53:4-54:18.) The assembly drawing identifies by part and drawing number each of the product's components. (*Id.*) A detail drawing contains all of the dimensional details about a component. (R. 233-10, Detail Drawing.) Zurn also creates assembly drawings for sub-assemblies of a

product. A complete set of assembly and detail drawings allows one to determine the dimensions of a product as well as its components, the configuration of those components, and how the product evolved into its current configuration.

### B. The CAD database

During the relevant time period, Zurn used a CAD drawing management system called Meridian.[4] The Meridian database kept track of changes to documents, including engineering documents, Excel files, TIFF files, drawings, and bit maps. (R. 233-5, Rodriguez 11/10/2010 Dep. Tr. 16:4-17:9.) It also housed the document's metadata, including but not limited to the document's creation date, the document number, the edits made to the document and the dates of such edits, the identity of the person who edited the document, the product number and product line under which the document was filed, the document's approval date(s), and notes and comments to the document. (*Id.* at 17:8-20:2.) Zurn is able to run a report from the Meridian system that contains a particular document or drawing's metadata. (*Id.* at 18:5-20:22.) Running such a report for all of the available metadata fields for all of the documents located in Zurn's Commercial Brass Division (which is the relevant division here) can be done at any time and takes only 20 seconds. (*Id.* at 36:8-21.)

---

[4] On April 14, 2010, Zurn converted the Meridian system into a system called "AutoCAD Vault." (R. 231-8, Zurn's Supp. Descr. at 1.) Zurn maintains that "[a]ll CAD drawings and their revision history were migrated from the Meridian system to the AutoCAD Vault system during [the migration] process." (*Id.* at 1-2.) The Meridian "product" is still in place, however, and is available in a read-only format. (R. 233-5, Rodriguez 11/10/2010 Dep. Tr. 21:19-22:7.)

Zurn's counsel used the Meridian database to locate some of the drawings it has produced in this case.[5]  Specifically, in mid-July 2010, Mr. Hasselman, Mr. Brian Clark (one of Zurn's outside counsel), and another person from the Webb Law Firm asked Ms. Rodriguez to run a report of the documents in the Meridian database.  (R. 233-5, Rodriguez 11/10/2010 Dep. Tr. 20:19-22; 33:1-35:16; R. 300, Rodriguez Decl. ¶ 3.)  The report that she ran listed the following information for every single document stored in the CAD database for Zurn's Commercial Brass Division in Sanford, North Carolina:  product line, product group, item group, document number, product number document type, document description, approved by, and approved date.[6]  (Id.)

### C.    Zurn's production of CAD drawings and related materials

Sloan contends that Zurn is withholding relevant CAD drawings and other related materials.  It asserts, for example, that Zurn has not produced assembly drawings for any portion of the accused device except for the handle assembly and has also not produced any detail drawings except for the retainer component.  (R. 233, Sloan's Mem. of Law at 8-9.)  Relying on deposition testimony from one of Zurn's witnesses, Sloan identifies specific drawings and

---

[5]  Sloan represents that despite searching internally for documents in the Meridian database, Zurn failed to disclose the existence of the database to Sloan in the parties' initial discussions regarding e-discovery planning.  (R. 233, Sloan's Mem. of Law at 6 n.2, 7.)  Further, Sloan states that after several meet-and-confers, Sloan's September 2010 motion for sanctions, and two orders from the Magistrate Judge regarding Zurn's discovery obligations, Zurn finally disclosed to Sloan on October 19, 2010 that its employees use the Meridian system.  (R. 231-8, Zurn's Supp. Descr. at 1-2.)  Zurn does not dispute this contention.

[6]  Sloan did not learn that Ms. Rodriguez had created such a report until her deposition in November 2010.  At that time, Sloan requested a copy of that report, which Zurn produced, albeit in a largely unreadable format one day before Sloan was scheduled to depose witnesses who it contends could have shed light on the document.  (R. 233, Sloan's Mem. of Law at 7 n.3.)

related documents that it believes Zurn has not produced (or for which Zurn has not searched). Sloan submits, for example, that Zurn likely has an assembly drawing for the diaphragm used in the accused device, which it claims is relevant because an email that Zurn produced indicates that Zurn modified a component of the diaphragm assembly from the pre-existing flush valve during the development process. (*Id.* at 8.) Sloan concedes that Zurn produced a few drawings that "might relate to the dual flush," but takes issue with the fact that Zurn did not produce them until December 2011, over a year after Sloan deposed Zurn's technical employees. (*Id.*)

Sloan further contends that Zurn has failed to produce other documents that would reveal similar information as the CAD drawings. In particular, Sloan submits that it can determine the component parts of a Zurn product even without the assembly drawings through a "bill of materials."[7] (*Id.* at 9.) Yet, Zurn has not produced the bills of materials for the accused device. Sloan also asserts that Zurn has failed to produce (1) records of "Engineering Change Notice Requests," which can be used to determine if Zurn made changes to a component during its development (*id.* at 9); (2) drawing spreadsheets (*id.* at 9-10); and (3) handwritten redlines of relevant pre-existing drawings (*id.* at 10.) Zurn also has not produced any "preliminary" or "prototype" drawings of the retainer or other components of the accused device. (*Id.* at 10-11.)

Zurn retorts that it has produced "hundreds of CAD drawings detailing virtually every aspect and component of its dual flush product, including critical dimensions, as well as several drawings of the pre-existing product on which it was based." (R. 257, Zurn's Opp. at 18.) Zurn

---

[7] One of Zurn's witnesses testified that if there is no assembly drawing for a particular product, Zurn's manufacturing department uses the bill of materials to figure out the components of the product. The witness further testified that Zurn sells products that have a bill of materials, but no assembly drawing. (R. 233-11, Ballachino 11/19/2010 Dep. Tr. 44:22-45:5.)

does not dispute, however, that it has not produced a complete set of drawings for the accused device. Instead, it contends that it has produced what it has in its possession, and concedes that it is possible that it discarded or destroyed drawings in the ordinary course of business given that it created the drawings in 2005, well before it could have reasonably anticipated this litigation. (*Id.* at 12-13.)

In support of its contention that it has produced all of the CAD drawings in its possession, Zurn relies on a second CAD drawing report that Ms. Rodriguez prepared, at the request of counsel, in April 2012.[8] Ms. Rodriguez states that the report includes a comprehensive list of every drawing in Zurn's CAD database, along with every single data field associated with each document. She also represents that she prepared a report of the revision history of certain files and drawings that Sloan had identified. (R. 300, Rodriguez Decl. ¶¶ 5-6.)

Sloan disputes that the Rodriguez Declaration contains complete and accurate information. Specifically, Sloan complains that the April 2012 CAD drawing report that Ms. Rodriguez prepared is incomplete because it omits drawings and revisions of drawings, and Zurn has not explained why certain drawings are missing. As an indication the report is incomplete, Sloan points to the fact that Zurn has produced hard copies of drawings that are not included in the April 2012 report. Sloan further contends that the revision history report for the dual flush retainer and single flush retainer do not accurately reflect the "check in" and "check out" activity for the drawings.[9] Finally, Sloan asserts that the Rodriguez Declaration is incomplete because it

---

[8] Ms. Rodriguez prepared such report after the parties had fully briefed Sloan's renewed motion for sanctions.

[9] The revision history report, for example, shows a "checked in" date of April 9, 2010 for every revision of drawing number 55887 beginning with revision A and ending with revision V,

does not address Sloan's assertion that Zurn is withholding preliminary and prototype drawings for the accused device.

### D. Zurn must take further action to confirm that it has produced the CAD drawings and related information

Given Zurn's past conduct of refusing to produce and/or ignoring its obligation to produce relevant drawings and reports from the Meridian system until ordered to do so and given the ambiguity in the Rodriguez Declaration, Zurn must file a sworn declaration with the Court by May 30, 2012 regarding the relevant electronic and hard copy documents and drawings. The declaration must: 1) supplement the Rodriguez Declaration with respect to the April 2012 CAD drawing report and explain the reasons for the missing drawings that Sloan has identified, as well as the reasons for the allegedly inaccurate check in and check out dates that Sloan has identified; and 2) state that it has thoroughly searched for and produced all of the drawing-related documents that Sloan has identified–namely, bills of materials, records of "Engineering Change Notice Requests," drawing spreadsheets, preliminary and prototype drawings, and handwritten redlines of drawings. Should Zurn need to run additional reports to correct inaccuracies in the April 2012 CAD drawing report, Zurn must do so and provide any revised reports to Sloan. Zurn must also produce any additional documents that it discovers in its search for the above-mentioned information no later than June 22, 2012.

---

and it shows a "checked in" date of April 14, 2010 for revisions A through D of drawing number 81202. (R. 303, Sloan's Supp. Resp. at 7.) Sloan surmises that these dates may reflect the date on which Zurn migrated the file from Meridian to the new Autodesk Vault system and not the date on which revisions were checked in or out during the development of Zurn's accused device. (*Id*.)

13

## II.    K:Drive

Sloan next asserts that Zurn's search of its networked storage drive, which it calls the "K:Drive," was fatally flawed.  The K:Drive serves as a file repository for Zurn's employees, and it is organized by department.  (R. 233-4, Johnston 11/10/2010 Dep. Tr. 73:15-74:5.)  Zurn's search of the K:Drive proceeded as follows:  Zurn's IT Systems Manager created a list of the file and folder names on the K:Drive for all departments and converted that list into a searchable text file, which he provided to Zurn's outside counsel for searching.  (R. 233-15, Hasselman 11/9/2010 Dep. Tr. 19:1-20:19.)  The list excluded compressed or "zipped" files.  (*Id.* at 62:19-63:1.)  Zurn's counsel then searched the text file using a "find and replace" search (i.e., hitting the "Ctrl" and "F" buttons at the same time and inputting the relevant terms to search).  (R. 233-4, Johnston 11/10/2010 Dep. Tr. 29:2-10; 34:2-21.)

Sloan's first complaint with Zurn's search of the K:Drive is that Zurn applied its search terms against the *names* of documents and folders stored on the K:Drive instead of applying the search terms against the *actual contents* of those documents.  As a result, if the title of the folder or the document did not contain one or more of the search terms, Zurn did not produce it. Second, Sloan objects to Zurn's method of searching for documents simply by using the Ctrl + F function, particularly because the search terms Zurn claims it used include Boolean search strings and wildcards, which cannot be employed using that function.[10]  Therefore, Sloan submits, Zurn's description of the searches it conducted is false.

---

[10]  Zurn's search terms included, for example, "dual" within 3 words of "flush," "flush volume" within 5 words of "var*," and "*635" within 4 words of "patent."  (R. 231-8, Zurn's Supp. Descr. at 5-6.)

In response, Zurn concedes that it did not search the contents of the documents stored on the K:Drive, but rather searched only the document and folder names. Zurn also does not dispute that the Ctrl + F function is incapable of employing Boolean search terms. Instead, it explains that one of its outside counsel reviewed the text file of the document and folder titles for the relevant search terms, including those with Boolean strings. Specifically, Zurn argues that "it is trivially easy for a reviewer to perform the function of boolean operators by visual inspection," and that "an attorney who was well-versed in the relevant issues of this case thoroughly and independently reviewed the directory using the identified search terms and retrieved all potentially relevant documents from the drive for production." (R. 257, Zurn's Opp. at 19 (citing 257-9, Johnston 11/10/2010 Dep. Tr. 28:5-43:10).)

### A. Zurn's search of the K:Drive is inadequate

There are three significant problems with Zurn's rudimentary search of its K:Drive. First, Zurn's statement that one of its attorneys independently reviewed the text file directory for documents containing Boolean search strings is unsupported by any citation to the record. Mr. Johnston, who did not perform the searches at issue, testified that he did not know how Mr. Clark, the attorney who performed the searches, searched for Boolean strings within the text file of the K:Drive directory listing. (R. 257-9, Johnston 11/10/2010 Dep. Tr. 29:2-42:2.) Indeed, he testified specifically that he was not present while Mr. Clark ran the searches, and he "can't speak to what [Mr.] Clark did." (*Id.* at 30:2-4, 40:21-22.) The second problem is that even if Mr. Clark visually reviewed the text file of the K:Drive directory listing, such a search is unreliable in this case and in this context, especially given the multiple, relatively complicated Boolean search strings and Zurn's counsel's admissions that the directory text file was very

large. (*Id.* at 35:20-36:8, 41:18-42:19.) Finally, Zurn's search of only the text of the folder and document titles fails to meet its obligations in this case. Instead, given the complexity, Zurn should have applied the search terms to the *contents* of the folders and documents as well as the document names. Zurn has not explained any reason why it could not have performed such a search.

### B. Bit-x-bit's subsequent searches do not demonstrate that Zurn's search of the K:Drive is adequate

Zurn's after-the-fact attempt to justify the propriety of its search does not allay the Court's concerns regarding the deficiencies described above. In its supplemental submission in opposition to Sloan's motion, Zurn's third party document vendor, bit-x-bit, through its representative, Mr. Scott Ardisson, submitted a declaration (the "Ardisson Declaration"). (R. 299, Ardisson Decl.) The Ardisson Declaration provides that bit-x-bit tested the effectiveness of Zurn's search of the K:Drive by running its e-discovery software search tools on a restored back-up tape of Zurn's K:Drive for year-end 2009. (*Id.* ¶ 8.) Bit-x-bit, however, did not apply the same search terms that Zurn used in its previous search of the K:Drive. Instead, it removed nine "suspect" terms that returned few relevant hits in other searches and added two new terms that Zurn did not use. (*Id.*) Bit-x-bit then created random sample sets of the electronic documents containing the hits from the four most frequently-found keywords–DF, retainer, bushing, and "dual NEAR flush"–which it then provided to Zurn's counsel to review along with all of the hits for the remaining search terms. (*Id.* ¶ 10.)

Zurn's counsel did not identify any potentially relevant documents in the sample sets for the search terms "bushing" and "retainer" (*id.* ¶ 11), which bit-x-bit interprets to mean that there are no relevant documents on the K:Drive containing those terms. Zurn's counsel identified four

potentially relevant documents in the sample set for keyword "DF," and based on that number, bit-x-bit estimates that there are approximately 228 potentially relevant documents containing that term in the larger set of documents.  (*Id.* ¶ 12.)  For the term "dual NEAR flush," Zurn's counsel identified two potentially relevant documents in the sample set, and based on that number, bit-x-bit estimates that there are 43 potentially relevant documents containing this term in the larger set.  (*Id.* ¶ 13.)  For the remaining search terms, Zurn's counsel identified 73 documents as potentially relevant.  (*Id.* ¶ 14.)  In sum, bit-x-bit estimates, based on the percentage of potentially relevant documents in the sample sets and additional documents that Zurn's counsel reviewed, that there are approximately 371 additional documents on the K:Drive which are potentially relevant.

Using bit-x-bit's search described above, Zurn's counsel identified 79 relevant documents.  (*Id.*)  Of those 79 documents, bit-x-bit states that 40 were "unique" and "not simply versions of another document," and "seven were duplicates of other documents reviewed."[11] (*Id.*)  Zurn had previously produced only two of these documents.  (*Id.*)  The Court interprets these numbers to mean that of the 79 documents, at least 31 were "new" in the sense that they were unique documents and not duplicates.  In other words, Zurn failed to produce at least 31 relevant documents.

If anything, bit-x-bit's search confirms that Zurn's search of the K:Drive was inadequate in that Zurn actually missed relevant documents in its search and thus failed to produce them.

---

[11]  It is unclear from the Ardisson Declaration whether the seven documents were also duplicates of other documents that Zurn has already produced.  Moreover, it is unclear what the distinction is, if any, between documents that are "not simply versions of another document" and "duplicates of other documents."

Bit-x-bit's search also confirms that Zurn's K:Drive likely contains additional potentially relevant documents.  It is difficult to rely on bit-x-bit's specific estimations regarding the amount of potentially relevant documents on the K:Drive, which it bases on the percentage of relevant documents in the sample sets it culled from the larger set of responsive documents.  Bit-x-bit did not single out the Commercial Brass Division, nor did it apply any date restrictions to the search.[12]  Using date restrictions and limiting the search to the Commercial Brass Division and any other relevant corporate divisions may eliminate the need for using "sample sets" and estimations of potentially relevant documents, thereby mitigating Sloan's concerns regarding Zurn's search methodology.

### C. Zurn must perform additional searches of the K:Drive

The Court orders the parties to meet and confer and file with the Court, by June 1, 2012, 1) an agreed set of reasonable search terms that Zurn must apply to the K:Drive; 2) agreed date restrictions for Zurn's search of the K:Drive; and 3) an agreed list of Zurn's corporate divisions that Zurn will search (e.g., Commercial Brass Division).  Zurn, through a third party vendor, whether it is bit-x-bit or some other vendor, must then search the contents of the K:Drive (i.e., not simply the document files and names) using the agreed-upon search terms, corporate divisions, and date restrictions, and it must turn over all relevant documents to Sloan by June 22, 2012.  Zurn must file a declaration with the Court by June 29, 2012, identifying the search terms, corporate divisions, and date restrictions that it employed in the search of the K: Drive, as well

---

[12]  Zurn has acknowledged that it is possible to isolate the Commercial Brass Division's documents on the K:Drive and search only those documents.  (R. 233-4, Johnston 11/10/2010 Dep. Tr. 74:6-8.)

as how many documents it produced to Sloan as a result of its search.[13]

## III.    J:Drive

The J:Drive consists of Zurn's employees' individual document storage folders.  Sloan argues that Zurn's search of the J:Drive was similarly inadequate because Zurn failed to identify all relevant custodians and used inadequate and inconsistent search terms.

Zurn's search of the J:Drive, while appearing to be more sufficient than its search of the K:Drive, is nevertheless deficient.  Zurn's Supplemental Description states that it searched the J:Drive of twelve custodians, including Carl Nicolia (President of Zurn Industries, Inc.), Michael Boone (Vice President of "Zurn"), Frank Lastowski (Sales/Marketing Director), Allen Becker (General Manager and former "Zurn" employee), Michael Funari (Manager of Engineering), Randy Foltz (Quality Control Supervisor), Roy Leviner (Draftsman), Larry Elting (Product Engineer), Sean Martin (Vice President of Sales and Marketing, Zurn Engineered Water Solutions), Tim O'Connor (former "Zurn" employee), Craig Wehr (Vice President of Sales and Marketing), and Doug Wroblewski (Manager of Engineering).  (R. 231-8, Zurn's Supp. Descr. at 4-5.)  According to Sloan, Zurn's custodians consist of those in Zurn's development group only, even though Sloan's document requests sought documents that would have pre- and post-dated the development group's activities and would include documents of other employees outside of Zurn's development group (e.g., marketing, sales, and purchasing groups).[14]  In response, Zurn claims that Sloan's characterization of its search is inadequate because bit-x-bit searched the

_____

[13]  This solution resolves Sloan's argument that Zurn used inadequate and ever-evolving search terms in its search of the K:Drive.

[14]  The Court notes, however, that at least some of the custodians appeared to have sales and marketing responsibilities.

J:Drive of 17 custodians in October 2010.[15]  (R. 299, Ardisson Decl. ¶ 17.)  Not only does this

representation differ from the one Zurn made in its Supplemental Description, Zurn also does not

identify the names of the 17 custodians.

Sloan's second argument is that Zurn used inconsistent search terms in its various

searches of the J:Drive.  Zurn has generated at least three separate sets of search terms.  (R. 231-

12, Chart of Search Terms.)  Zurn does not dispute that it has used inconsistent search terms, but

relies on the fact that bit-x-bit ran a search in October 2010 with the 38 search terms listed in

Exhibit B to the Ardisson Declaration.  (R. 299, Ardisson Decl. ¶ 4.)  Zurn appears to argue that

bit-x-bit's search resolves Sloan's concerns regarding the varying search terms Zurn employed

previously.[16]  Zurn's description of bit-x-bit's search, however, differs from the representations

Zurn made in its Supplemental Description, even though bit-x-bit apparently ran its search on or

around October 15, 2010.  (*Id.*, Ex. B.)  There is no indication that Zurn submitted a revised

Supplemental Description to Sloan or to the Court to reflect that it had run this additional

search.[17]  Moreover, it is unclear if and when Zurn produced the documents from this search to

---

[15]  Sloan complains that Zurn did not disclose during its witnesses' Rule 30(b)(6) depositions that bit-x-bit had run these particular searches.  The Court also finds it specious that despite bit-x-bit having run the searches on October 15, 2010, four days before Zurn provided its court-ordered Supplemental Description, Zurn did not provide any detail regarding these searches nor did it produce a witness from bit-x-bit to testify regarding its searches.

[16]  In its search of the J:Drive, bit-x-bit deleted nine "suspect" search terms that it deemed over-inclusive, and it employed a similar "sample set" methodology as it did for the K:Drive, described above.

[17]  Zurn's Supplemental Description disclosed that Zurn had retained bix-x-bit to review Zurn's ESI search and collection to-date.  (R. 231-8 at 10.)  Zurn specifically stated that "[b]it-x-bit has begun and will continue working with Zurn's counsel and Zurn personnel to identify and perform additional data captures, undertake de-duplication efforts, execute keyword searches and, if necessary, prepare production sets for seasonable supplementation by Zurn."  (*Id.*)  Zurn did not, however, disclose the details of any of bit-x-bit's searches or conclusions.

Sloan.

As explained above, Zurn has been less than forthcoming with respect to the search procedures it has employed, which has justifiably caused Sloan to question Zurn's methodology. The Court therefore orders the parties to meet and confer and file with the Court, by June 1, 2012, an agreed-upon list of reasonable search terms, custodians, and proposed date restrictions that Zurn must apply to a renewed search of the J:Drive. Zurn, through a third party vendor, whether it is bit-x-bit or some other vendor, must then search the entire contents of the agreed-upon custodians' J:Drive using the agreed-upon search terms and date restrictions. Zurn must turn over all relevant documents to Sloan by June 22, 2012. Zurn must also file a declaration with the Court by June 29, 2012, identifying the search terms, custodians, and date restrictions it used in its supplemental search of the J:Drive, as well as the number of documents it produced to Sloan as a result of the search.

## IV. CCM Machine

Zurn has a coordinate measuring machine ("CCM"), which is an advanced computerized instrument that measures parts of a physical object and generates a three-dimensional computerized model. Zurn's CCM operator, Mr. Randy Foltz, testified that the CCM has a probe that inspects parts and generates data points that one can view on a computer screen. The data points are saved to the CMM's hard drive. (R. 233-17, Foltz 12/3/2010 Dep. Tr. 60:22-62:2.) Zurn has not produced any data from its CCM in this case. Sloan argues that Zurn likely has ESI from its CCM regarding its analyses of Sloan's dual flush product. Sloan also takes issue with Zurn's counsel's prior representations to the Magistrate Judge regarding whether the CCM was hooked up to a computer. Specifically, Sloan argues that contrary to Zurn's counsel's

representations to the Magistrate Judge in October 2010, Mr. Foltz testified that Zurn had a dedicated computer connected to the CCM. Mr. Foltz's testimony indicates that the computer crashed at some point after Sloan filed this lawsuit, and that the data on the computer was not recoverable.

Zurn disagrees that it is has withheld relevant CCM data, relying on Mr. Foltz's testimony that he has not performed any competitive analyses of Zurn's flush valves and he is not aware of anyone else at Zurn who has done so (R. 260-7, Foltz 12/3/2010 Dep. Tr. 33:2-22), and on bit-x-bit's search of the user data from the hard drive of the computer connected to the CCM. (R. 299, Ardisson Decl. ¶ 16) (stating that bit-x-bit performed a "a forensic capture of the user data from the hard drive of the computer connected to the CCM . . . on October 12, 2010" and thereafter searched the data).) In his declaration, Mr. Ardisson states that bit-x-bit's search revealed thirteen keyword hits on five electronic documents from the hard drive that was connected to the CCM, and it provided those five documents to "counsel." (*Id.*) Bit-x-bit also collected a second CCM-related hard drive of which it performed a search on March 30, 2012 using a "revised" set of keywords. This search returned one document, which was duplicative of one of the five documents that turned up in the October 2010 search.

Because the Ardisson Declaration lacks relevant detail as to what search terms bit-x-bit used in its searches of the CCM data, the Court cannot determine if Zurn has complied with its obligations with respect to the CCM. Accordingly, Zurn must file an affidavit by May 30, 2012, that (1) states whether Zurn's CCM was ever used to analyze any of Sloan's flush valves; (2) identifies the particular search terms bit-x-bit used in its searches of the CCM-related hard drives; and (3) identifies the date ranges of the documents on the CCM-related hard drives that

bit-x-bit searched.  Zurn is also ordered to produce to Sloan, on or before May 30, 2012, the five

responsive documents from the October 2010 search to the extent it has not already done so.

## V.      Rule 30(b)(6) Witnesses

Sloan challenges Zurn's preparation of its Rule 30(b)(6) witnesses.  Specifically, Sloan

complains that the witness from Zurn's third party vendor, CliCKs, did not bring to the

deposition the job tickets identifying the particular custodians and search terms used in specific

searches.  Because of the remedies the Court is providing to Sloan in terms of additional

searches that Zurn must complete and additional detail regarding those searches that Zurn must

provide, Sloan's argument with respect to Zurn's Rule 30(b)(b) witnesses is moot.

## VI.     Document Preservation Notice

Parties to a lawsuit have a broad duty to preserve discoverable materials.  *See Jones v.*

*Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *6 (N.D. Ill. May 25, 2010)

("A defendant has a duty to preserve evidence that it has control over and which it reasonably

knows or can foresee would be material (and thus relevant) to a potential legal action."); *Danis*,

2000 WL 1694325, at *32, *36 (citing cases).  The duty to preserve arises when the party knows

or should know that litigation is imminent.  *See Trask-Morton v. Motel 6 Operating L.P.*, 534

F.3d 672, 681 (7th Cir. 2008) (finding that the defendant did not have a duty to preserve

documents until it received a pre-litigation demand letter from the plaintiff's attorney) (citing

cases); *Jones*, 2010 WL 2106640, at *6 (the duty to preserve "arises when a reasonable party

would anticipate litigation and does not depend on a court order") (citing *Trask-Morton*, 534

F.3d at 681).  "A party fulfills its duty to preserve evidence if it acts reasonably."  *Jones*, 2010

WL 2106640, at *6 (citation omitted).  Parties in litigation have an obligation to take "concrete

23

actions reasonably calculated to ensure that relevant materials will be preserved." *Id.* (quoting *Danis*, 2000 WL 1694325, at *36, *38); *see also Northington v. H & M Int'l*, No. 08-CV-6297, 2011 WL 663055, at *11 (N.D. Ill. Jan. 12, 2011) (noting that the duty to preserve documents "requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials") (citation omitted).

### A.     The parties' respective positions

Zurn asserts that "a litigation hold memorandum was forwarded to key Zurn employees on February 10, 2010."[18]  (R. 257, Opp. at 15.)  Sloan contends that Zurn did not adequately distribute the litigation hold memorandum to the relevant custodians and that, even if it did, it distributed the memorandum too late.  Specifically, Sloan argues that Zurn anticipated this litigation as early as 2008 or 2009, as evidenced by the fact that it has sought to withhold documents from those years from production in this case based on the work product doctrine. *See Sloan*, 2012 WL 1237744, at *1-5 (holding that certain Zurn testing documentation from 2008 and 2009 was factual information and therefore not subject to work product protection).[19]

### B.     Zurn's document preservation efforts

After reviewing the parties' briefs, the Court ordered Zurn to file an affidavit signed by one of its officers (1) confirming that a litigation document hold memorandum was sent to

---

[18]  Sloan filed its Complaint against Zurn on January 13, 2010 and served it on January 19, 2010.  (R. 1, Compl.; R. 15, Aff. of Special Process Server.)

[19]  As clarified in its reply brief, it appears that Sloan's argument is not that the Court should sanction Zurn for failure to preserve documents per se, but rather that ordering Zurn to perform additional searches for responsive documents at this point is futile because "Zurn employees have demonstrably been destroying information."  (R. 261, Sloan's Reply at 8-9.)

Zurn's employees regarding documents and electronic information pertaining to this litigation; and (2) identifying the date on which the memorandum was sent, to whom it was sent, and the delivery method used.  On May 8, 2012, Zurn filed a sworn declaration signed by Ms. Patricia M. Whaley, the Vice President, General Counsel and Secretary of Zurn Industries, LLC (the "Whaley Declaration").  (R. 309, Whaley Decl. ¶ 1.)  In it, Ms. Whaley states that on February 10, 2010, she received an email from Michael Vertullo at the Webb Law Firm, on which Zurn employees Michael Boone (General Manager-Commercial Brass), Michael Funari (Manager of Engineering), and Carl Nicolia (President) were copied.  (*Id.* ¶ 2.)  Attached to the email were the following documents: 1) a letter from Foley & Lardner to Paul Reznick, who is an attorney at the Webb Law Firm, regarding ESI; 2) a letter from Mr. Reznick to Ms. Whaley dated February 10, 2010 regarding preservation of ESI; and 3) an intraoffice litigation hold memorandum to Zurn employees.  (*Id.*)

The Whaley Declaration attaches the litigation hold memorandum.[20]  (*Id.*, Ex. A.)  The memorandum is addressed to "Zurn Employees" and contains a subject line stating "Sloan v. Zurn," but it is undated and does not identify whom it is from.  (*Id.*)  It states as follows:

> We require your assistance in identifying and preserving potentially relevant documents and electronic data in the above-identified lawsuit, which may include documents and electronic data relating to:
>
> • Development, marketing, manufacture or sale of Zurn's Dual Flush Handle products.
>
> • Wearing of brass bushing passages in handle assemblies.
>
> • Use of tapered bushing passages in handle assemblies.

---

[20]  Zurn did not attach the above-referenced email or letters to the Whaley Declaration or otherwise provide them to the Court.

- Development of Sloan's dual flush handle.

"Electronic data" as used here means audio recording, videotapes, emails, instant messages, word processing documents, spreadsheets, databases, calendars, telephone logs, contract manager information, internet usage files and all other electronic information maintained, creased [sic] and/or received on Zurn's systems. Zurn has an obligation not only to preserve hard copies of documents, but also the electronic data, which may correspond to a hard copy. Printing a hard copy of a piece of electronic data does not satisfy Zurn's obligation to preserve that electronic data.

"Systems" as used here means computer hard drives, network servers, removable media, laptops, portable electronic devices (PDAs)[,] blackberry devices, and any other devices that stores [sic] electronic data.

In order to comply with its legal obligations, Zurn must immediately preserve all existing documents and electronic data potentially relevant to this lawsuit, and suspend deletion, overwriting or any other possible destruction of such potentially relevant documents and electronic data. Electronic data is an important and irreplaceable source of discovery and evidence in this matter. You must take every reasonable step to preserve this information until further notice. ***Failure to do so can result in extreme penalties against Zurn.***

If you are a person who has generated any documents or electronic data that contains any potentially relevant information, please immediately preserve all such documents and data and contact Carl Nicolia.

Thank you for your efforts.

(*Id*.) (emphasis in original). Ms. Whaley states in her declaration that "Zurn's investigation of this matter to date reveals" that the following additional Zurn employees received the litigation hold memorandum via email on or about February 11 and 12, 2010: Frank Lastowski (Sales Manager/Project Manager for Flush Valve Products), Jody Randall (Supervisor of Customer Service for Commercial Brass), James Hasselman (Systems Manager), and Lynn Brumagin (Director of IT). (R. 309, Whaley Decl. ¶ 3.) According to the Whaley Declaration, "[o]ver the weeks that ensued, Webb and Mr. Hasselman began the process of identifying custodians and

26

capturing ESI."  (*Id.* ¶ 4.)

It appears from the Whaley Declaration that only eight Zurn employees, including Zurn's General Counsel and personnel in Zurn's IT department, received the litigation hold memorandum in mid-February 2010.  Of the twelve custodians that Zurn identified in its Supplemental Description, only four received the litigation hold memorandum in February 2010. It is unclear which, if any, Zurn employees received the memorandum on a later date.  As discussed below, Zurn's employees' deposition testimony confirms that several relevant employees did not receive the litigation hold memorandum or other direction to preserve relevant documents and electronic data.  Others recalled being told verbally not to delete documents, but not until relatively late in the litigation.

Although Zurn represents that Mr. Funari, who designed the accused device, received the litigation hold memorandum on February 10, 2010, he testified during his deposition that he was not familiar with a "document hold" and that he did not recall anyone advising him not to delete any documents.[21]  (R. 233-6, Funari 11/9/2010 Dep. Tr. 31:3-9.)  Ms. Rodriguez, Zurn's CAD supervisor, likewise testified during her deposition on November 10, 2010 that no one had sent her an email or memorandum regarding the obligation to preserve information and preserve documents for this lawsuit, nor did anyone advise her orally of this obligation.  (R. 233-5, Rodriguez 11/10/2010 Dep. Tr. 21:1-13.)  Indeed, Ms. Rodriguez testified that she did not learn of this litigation until July 2010, five months after Sloan filed its Complaint.  (*Id.* at 20:19-22.) In addition, Mr. Randy Foltz, Zurn's CCM operator, testified that no one had ever instructed him

---

[21]  Although Zurn's brief states that the litigation hold memorandum "clearly identifies Mike Funari as a recipient" (*id.*), the copy of the memorandum Zurn provided to the Court did not identify any specific employees as recipients.

27

to preserve documents.  (R. 233-18, Foltz 12/3/2010 Rule 30(b)(6) Dep. Tr. 26:9-22.)  He further

testified that he receives emails stating that his email inbox is over the allowed limit, and when

he does, he deletes emails so that he is below the limit.  (R. 233-17, Foltz 12/3/2010 Dep. Tr.

35:2-36:17.)  Other Zurn employees also receive these notifications.  (*Id.* at 36:14-16.)  In 2010,

Mr. Foltz deleted emails according to this personal protocol.  (*Id.* at 37:1-5.)

Other Zurn witnesses testified that no one instructed them to preserve documents until

relatively late in the litigation.  Joseph Ballachino, a draftsman, testified that he did not recall

anyone telling him that he needed to preserve his emails because of this lawsuit until right before

"they copied [his] hard drive."  (R. 233-11, Ballachino 11/19/2010 Dep. Tr. 90:6-91:3.)  Mr.

Ballachino also testified that on occasion, he deletes emails to reduce space, and that he had done

so during 2010.  (*Id.* at 90:9-12.)  He did not know whether he deleted any emails relating to the

development of the accused device.  (*Id.* at 90:16-18.)  Mr. Roy Leviner, another draftsman, also

testified that no one instructed him to preserve documents until two weeks before his deposition,

which was taken on November 19, 2010.  (R. 233-13, Leviner 11/19/2010 Dep. Tr. 13:22-14:14.)

Notably, Zurn did not attempt to refresh those witnesses' recollections or correct the record after

these witnesses' depositions.

## C.   Zurn must provide additional information regarding its document preservation efforts

The testimony of Zurn's witnesses identified above raises concerns about the

reasonableness of Zurn's document preservation efforts.  The record, however, is devoid of

additional necessary information for the Court's analysis.  *See ChampionsWorld, LLC v. United

States Soccer Fed.*, 276 F.R.D. 577, 582 (N.D. Ill. 2011) (explaining that before issuing

sanctions for a party's failure to preserve documents, the Court must find that the party breached

a duty to preserve evidence, the other party was harmed by the breach, and the breach was caused by the breaching party's willfulness, bad faith, or fault) (citing *Jones*, 2010 WL 2106640, at *5). In particular, it is unclear whether, upon receiving the litigation hold memorandum in mid-February 2010, Zurn's IT personnel took any steps to block employees' emails or other electronic documents from being deleted permanently. Further, Zurn has not provided the Court with information regarding whether any back-up files exist that contain the emails and other electronic files that Sloan asserts were potentially destroyed. Finally, the Court cannot ascertain from the record what measures, if any, Zurn took to preserve hard copy documents.

Additionally, the issue of when Zurn's obligation to preserve evidence arose also requires a more fully-developed record. It is not clear whether the documents that Zurn created regarding valve testing in 2008 and 2009 were indeed created in anticipation of this litigation. There is also no evidence in the record regarding the extent to which the parties engaged in pre-litigation discussions that might have alerted Zurn to the potential for litigation. *See, e.g.*, *Trask-Morton*, 534 F.3d at 681 (obligation to preserve documents arose, at the earliest, when the defendant received a pre-litigation demand letter from the plaintiff).

In short, it is premature to conclude, based on the record, that Zurn has permanently destroyed relevant documents. The Court orders Zurn to file an affidavit with the Court by May 30, 2012, that: (1) identifies the specific procedures Zurn's IT personnel undertook upon receiving the litigation hold memorandum in February 2010 to ensure that Zurn would preserve its electronic data; (2) identifies the extent to which back-up files for the relevant time periods exist and for what data; and (3) identifies what steps Zurn undertook to preserve relevant hard copy documents. Additionally, Zurn must file with the Court by May 30, 2012 all document

retention policies that have been in effect during this litigation. If back-up files for the relevant time period exist, Zurn must perform the searches explained above on the back-up files and must produce to Sloan all relevant, non-duplicative documents from those files by June 22, 2012. If, after Zurn has run all of the additional searches as explained in this Order and produced documents regarding those searches, Sloan is still of the opinion that Zurn has failed to preserve relevant documents, Sloan may file an appropriate motion.

## VII.    Attorney's Fees

The parties have spent significant time and effort arguing about Zurn's discovery efforts (or lack thereof) in this case over the past two years. Zurn has failed to adequately search for and produce relevant documentation to which Sloan is entitled under the Federal Rules of Civil Procedure and the Northern District of Illinois' Local Patent Rules.[22] The Court has previously sanctioned Zurn for its discovery conduct in this case. *See, e.g.*, R. 285.

This case presents a perfect example of why agreeing on a comprehensive e-discovery protocol at the outset of a case is so important. *See generally* Seventh Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information* (Rev. Aug. 1, 2010). Of particular relevance here, Principle 2.01 sets forth the parties' duty to meet and confer on discovery and to identify disputes for early resolution. Among the issues to be discussed are the identification of relevant and discoverable ESI and documents, including methods for identifying such information, and the scope of discoverable ESI and documents that

---

[22]    When Sloan filed its first motion to compel in July 2010, Zurn had produced 5,541 pages of documents. Zurn thereafter produced 488 additional pages. Despite certifying to Sloan in August 27, 2010 that it had not withheld any responsive documents to Sloan's document requests, Zurn has produced 5,512 additional pages of documents since then.

the parties will preserve.[23]  Both parties in this case assert that they attempted to agree upon such issues and they each blame the opposing party for backing out.  The Court need not resolve the issue of which party is right.  The parties' continued failure to meet and confer in good faith and to cooperate with each other has resulted in a significant waste of their respective clients' (and the Court's) time and resources.  As the Magistrate Judge observed in October 2010 and as the Court has repeatedly admonished, the parties in this case have displayed a serious lack of ability or willingness to communicate with one another in an effective way to resolve their discovery disputes.

That said, Zurn's inadequate searches and less than forthcoming representations to the Court regarding the discovery it has undertaken in this case warrant monetary sanctions.  Consequently, the Court orders Zurn to pay the attorney's fees and costs for Sloan's renewed motion for sanctions and reply in support thereof, as well as Sloan's supplemental submission in response to Zurn's supplemental submission.  Zurn is also ordered to pay the attorney's fees and costs for Sloan's September 20, 2010 motion for sanctions.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Sloan's renewed motion for sanctions.  Specifically, the Court denies Sloan's motion to the extent it seeks a default judgment and an adverse inference/finding, but grants the motion to the extent it seeks alternative relief and attorney's fees.  The Court reopens discovery until June 22, 2012 to allow Zurn to produce additional discovery consistent with this Order.  The parties must meet

---

[23]  Additionally, the "attorneys for each party shall review and understand how their client's data is stored and retrieved before the meet and confer discussions in order to determine what issues must be addressed during the meet and confer sessions."  *See id.* at Principle 2.01.

and confer regarding scheduling and, if necessary, submit a revised proposed scheduling order to the Court by May 25, 2012. Zurn is ordered to pay Sloan's attorney's fees as set forth in this Order. Sloan should submit a fee petition on or before August 3, 2012, and Zurn shall respond on or before August 10, 2012.

DATED: May 23, 2012                    ENTERED


_____
AMY J. ST. EVE
United States District Court Judge