UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SLOAN VALVE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10-cv-00204 |
| vs. | ) | |
| | ) | Judge Amy J. St. Eve |
| ZURN INDUSTRIES, INC., and ZURN INDUSTRIES, LLC, | ) ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF *DAUBERT*
MOTION TO EXCLUDE TESTIMONY OF EDWARD M. CAULFIELD**

> Q.  *Do you know what a flushometer is?*
> A.  *Not off the top of my head.*[1]

**I.     INTRODUCTION**

Edward Caulfield is not a manual flush valve handle expert, a plumbing testing expert or a lawyer, yet he seeks to offer opinions as if he were all three. For reasons relating to both Caulfield's lack of qualifications to render the opinions set forth in his report, as well as the unreliability and irrelevance of those opinions, Caulfield's opinions should be excluded, and he should be barred from offering any testimony in this matter. In particular:

- Caulfield repeatedly asserts what he believes are absolute scientific principles from his general experience as a mechanical engineer without any knowledge of how those principles apply to the relevant field of art. Such general "past experience" testimony has resulted in Caulfield's exclusion as an expert witness as recently as February 2013, and likewise requires his exclusion in this case.

- Caulfield is not qualified to analyze life cycle testing for manual flush valve handles, and he

---

[1] Caulfield Dep. at 17:24-18:1, attached hereto as Exhibit 2.

has not performed the requisite background research and analysis to render any opinions regarding life cycle testing or the behavior of manual flush valve handles.

- Caulfield is not qualified to analyze the ramifications of reliance on life cycle testing in rendering a legal opinion of counsel. He certainly is not qualified to determine how such reliance factors into a determination of willful patent infringement. His opinions impermissibly parrot attorney argument on the issue of willfulness.

- Even if Caulfield had the necessary qualifications, his proposed testimony invades the province of the fact-finder regarding significance of the reliance on the life cycle testing.

- Caulfield's opinion includes unsubstantiated speculation that the test stand used by Zurn was built to "defeat this patent", which is improper conclusory testimony.

## II.    RELEVANT FACTUAL BACKGROUND

Sloan alleges patent infringement of U.S. Pat. No. 7,607,635. *See* Amended and Supplemental Complaint (Dkt. 197). On January 28, 2013, Sloan served the Expert Report of Edward M. Caulfield ("Caulfield Rep.") attached hereto as Exhibit 1. This forty-two paragraph report indicates Caulfield intends to offer testimony regarding Zurn's "reliance on certain 'life cycle testing' conducted by Zurn in support of their position that they have not willfully infringed the patent in suit." Ex. 1 at ¶ 2. Caulfield states he has been "asked to provide an opinion as to whether the 'life cycle testing' procedure that Zurn used to produce data was realistic enough such that a ***reasonable*** company in Zurn's position could have ***reasonably relied*** on advice provided by its lawyer, based on this data, regarding the validity of the Sloan patent." *Id*. at ¶ 10 (emphasis added). On May 23, 2013, Caulfield was deposed ("Caulfield Dep.").

### A.    Caulfield is neither a plumbing fixture expert nor a lawyer.

Caulfield is a mechanical engineer without any plumbing expertise, especially in the area

of manual flush valve handles. *Id*. at ¶ 3. Caulfield testifies that the extent of his work that even loosely relates to plumbing products dealt with the materials used for construction of the products (*i.e*., plastic construction, for example), not the actual functioning of flush valve assemblies. Caulfield Dep. at 12:13-13:9, attached as Exhibit 2. Caulfield is not familiar with basic terminology associated with the technology at issue. *Id.* at 17:24-18:1 ("Q. Do you know what a flushometer is? A. Not off the top of my head."). Caulfield never studied a manual flush valve handle prior to his retention in this litigation. Caulfield states:

> Q. Had you ever studied any manual flush valve handles before your involvement in this lawsuit for any reason other than your use of public restrooms in your personal life?
>
> A. I don't believe I've seen the manual flush valve in any issue that I have worked on so the answer would be no other than I use them every day of my life.

*Id*. at 16:23-17:6. Caulfield does not know the expected useful life of a flush valve handle, even though he opines on how such a handle wears without the benefit of any supporting test data. *Id*. at 116:14-117:7. He did not perform any of his own testing to discount the results of the wear testing proffered by Zurn; instead, he denies that even though a part in normal use shows "wear" that such part could be "worn out" in the fashion demonstrated by the physical specimens resulting from the Zurn life cycle testing. *Id*. at 96:16-97:7. He incorrectly discounts that bushings wear out, and that repair kits are sold which allow for continued operation and further wear on retainers. *See* Jahrling Dep. at 47:15-48:22, attached hereto as Exhibit 6.

Caulfield has no formal legal education, *id*. at 8:6-7, and he was unable to recall any prior instance of opining on willful infringement. *Id*. at 21:18-24:1. Caulfield's report includes two paragraphs relating to the law of willfulness. *See* Ex. 1 at ¶¶ 13-14. Indeed, Caulfield assumes in his report that an objectively high likelihood exists that Zurn's actions constitute patent infringement. *Id*. at ¶ 15. This legal discussion of willfulness was not authored by Caulfield, but

was instead provided to Caulfield by trial counsel for Sloan. Ex. 2 at 31:4-13; 31:24-32:10 ("Q. Prior to your work in this case, do you recall ever having occasion to make yourself familiar with the law on willfulness? A. I think I've read the law on willfulness. ***To be honest with you, I don't understand it because I'm not an attorney***. I rely on the patent attorneys for that.") (emphasis added). This is the first expert opinion Caulfield has provided in his tenure as a paid consultant that critiques an accused infringer's reliance on an opinion of counsel for non-willfulness, *id.* at 88:5-10, and yet, he is unaware of the basics of willful infringement analysis, and did not know if an opinion of counsel is required to avoid a willfulness claim. *Id*. at 89:18-90:4. Despite his lack of formal education or experience relating to willfulness determinations, Caulfield opines that "it would be both objectively and subjectively reckless for Zurn to have relied on the results of its 'life cycle testing'". Ex. 1 at ¶ 42. Even though, by his own words, Caulfield does not understand the standard for determining willfulness.

      **B.**      **Caulfield is not qualified to analyze plumbing fixture life cycle testing.**

In his report, Caulfield criticizes Zurn's life cycle testing based on the following six factors identified by Caulfield: (1) number of cycles of handle actuation; (2) frequency of cycles; (3) presence of running water or other coolant/lubricant; (4) the direction and magnitude of the force exerted by the spring-loaded member; (5) the orientation of handle actuation; and (6) the presence of the rubber cap. Ex. 1 at ¶ 33. Caulfield generally argues that the test stand utilized by Zurn for life cycle testing is flawed. However, Caulfield has no factual or experiential basis to know if Zurn or other plumbing manufacturers regularly use such a test stand for exactly this type of life cycle testing. Caulfield testifies:

> Q. Yeah, but you really don't know whether or not it's regular practice for Zurn or other plumbing equipment manufacturers to – to test the life cycle and wear of handle retainers on a stand such as what is on Funari Exhibit 251, right?

4

> A.      I don't know that for a fact, but I would be surprised from the engineering standpoint if a wear test – the handles I'll give you but not the stems or the retainers. That's not the right way to wear test those.
>
> Q.      That's your supposition, right?
>
> A.      Supposition from the engineering mechanics point of view. The dots don't connect from the engineering point of view to what happens in a flush valve.
>
> Q.      You've never discussed that with any Sloan engineers, right?
>
> A.      Discussed? What's that?
>
> Q.      Whether or not retainer life and wear is ordinarily tested on a stand such as shown in Exhibit Funari 251?
>
> A.      That thing I have not specifically discussed that fact. I doubt if they would do it that way, Sloan.
>
> Q.      But you haven't discussed with Sloan how they would do it, right?
>
> A.      That's correct.

Ex. 2 at 65:19-67:5. Caulfield does not know if or how, in the regular course of business, Sloan conducts life cycle testing for wear on brass or plastic retainers. *Id*. at 79:23-80:5. He has not reviewed any standards in the plumbing industry for life cycle testing. *Id*. at 80:7-10. Rather, Caulfield approaches his analysis completely uninformed as to the standard protocols and practices used in life cycle testing, and thus, his opinions are not those of an expert in this field.

Indeed, his specific six criticisms are made without any understanding of the field of art. Even though Caulfield complains about the frequency of the test cycles, he admits he does not know whether wear is frequency dependent here, and he concedes he has no idea what amount of heat is allegedly generated by increased frequency of the cycles or what effect would actually be realized by a slower frequency of test cycles. *Id*. at 67:6-23, 111:1-20 and 112:6-9 ("Q. And you have no idea of what amount of heat generation is in this situation, do you? A. I don't think anybody does except that they're running them fast.").

5

Caulfield criticizes the absence of water from the testing model, but does not have data to support his claim that water is usually used for testing handle life cycles. He offers no testimony regarding what impact water would have on such testing. *Id.* at 67:6-23 and 78:17-24. Caulfield does not know if it is standard industry practice to conduct wet testing, but rather opines, without support, that it "should be". *Id*. at 97:23-98:8 ("Q. Okay. But you – you don't know whether standard practice in the industry for wear testing manual valve handles is to test them wet? A. It should be if you are looking at realistic wear tests. Q. That's according to Dr. Caulfield, though? A. No. I think it's according to engineering mechanics, principles and Dr. Caulfield."). Moreover, Caulfield suggests that the test stand should randomize the direction of handle actuation, but he has not studied handle actuation direction and has no evidence to suggest that the method of handle actuation direction has caused any additional wear. *Id*. at 144:1-23.

Caulfield claims that the rubber cap on the plunger creates a centering force, but later concedes that he did not study the effect of the cap as a centering force, and has conducted no tests to suggest his theory is reality. *Id*. at 148:20-149:4 ("Q. So did you ever do any testing or analysis to confirm this centering effect of the boot or rubber cap on the plunger? A. I don't have to do analysis. It's logical from the engineering standpoint that's going to attempt to center the plunger.") and 152:8-23. Indeed, he also states that the rods were eccentrically loaded, but later acknowledges that, in actual practice, the plunger tip would have different contact points in a normal wear situation, which occurs with the test stand set up. *Id*. at 137:18-24

Caulfield asserts that 100 psi is a higher amount of force than usually found in plumbing lines, but does not support that premise with any factual evidence. Had he even bothered to look at the publicly available installation instructions for Sloan flushometers (if he knew what that was), he would have seen they operate with 10 to 100 psi water pressure (*see* Exhibit 4 attached

6

hereto and available at http://www.sloanvalve.com/Installation_Guides/0816558.pdf). *See also* Exhibit 5 (ASSE standard submitted by Ballanco during reexamination that states in section 2.2.1 that flushometers are designed to function at cold water pressure up to 125 psi and to withstand intermittent shock pressures up to 180 psi).

Caulfield complains that without knowing the number of cycles, it is impossible to know if the handle assembly would be replaced prior to incurring that many cycles. However, Caulfield offers no testimony regarding what the number of cycles should be in the lifetime of a product, nor any test data to indicate the life cycle of a handle. In short, Caulfield offers testimony on general principles, but he does not understand how his general principles are actually applied in the field of art and whether any of these criticisms are legitimate in relation to the handles being tested. Moreover, without an understanding of how testing is normally done, he has no basis to determine the magnitude of any of these criticisms in relation to the results obtained by Zurn's testing.

      **C.**     **Caulfield offers conclusory testimony.**

Caulfield suggests that the test stand was set up to "defeat this patent" which he then further concludes is "willful infringement." *Id*. at 82:16-21 and 83:9-12. He claims the intent of the test stand was to "grind" the retainer, as opposed to showing legitimate wear. Caulfield offers this analysis of the intent purportedly behind Zurn's life cycle testing, even though he admits he has no factual basis to make such allegations. *Id.* at 139:19-140:9 and 141:8-142:6.

**III.**     **LEGAL STANDARDS FOR *DAUBERT* AND ADMISSIBILITY**

Trial judges are gatekeepers assessing the admissibility of expert testimony from both a relevance and reliability standpoint. *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008); *Bone Care Int'l LLC v. Pentech Pharms., Inc.*, Case No. 08-CV-1083,

2010 U.S. Dist. LEXIS 105118, at *5 (N.D. Ill. Oct. 1, 2010).[2] Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert*, the trial court assesses whether the proposed expert's testimony reflects valid scientific knowledge, ruling out subjective belief and unsupported speculation, and then determines whether the evidence or testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). The analytical factors are flexible. *Daubert* sets forth a non-exhaustive list of guideposts to consult in assessing the reliability of expert testimony, including: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical or professional community. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (*citing Daubert*, 509 U.S. at 593-594).

In addition, the 2000 Advisory Committee's notes to Rule 702 of the Federal Rules of Evidence identify additional benchmarks for gauging testimony, including whether the testimony relates to matters growing naturally and directly out of research the proposed expert has conducted independent of the litigation; whether the proposed expert has developed opinions expressly for purposes of testifying; whether the expert has adequately accounted for obvious alternative explanations; and whether the expert is being as careful as he or she would be in his or her regular professional work outside of his or her paid litigation consulting. *Id.* (citations

---

[2] Copies of cited authorities only published on electronic databases are attached as Exhibit 3.

omitted). Nothing, however, requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert; "[i]n other words, 'an expert who supplied nothing but a bottom line supplies nothing of value to the judicial process." *Bone Care*, 2010 U.S. Dist. LEXIS 105118, at *9 (citations omitted).

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). Any proffered expert must be a person of ordinary skill in the art in the technical art area of the patent to offer any potentially useful opinion to the jury. *See Sundance*, 550 F.3d at 1362, 1363 ("it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfrngement or invalidity unless that witness is qualified as an expert in the pertinent art.").

A gatekeeper must ensure that testimony is not provided on the law that usurps the role of either judge as the instruction-giver, or the jury as fact-finder. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012) ("the ultimate legal questions of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent [in rendering a decision on the objective recklessness prong of a willfulness determination] should always be decided as a matter of law by the judge"); *Se-Kure Controls, Inc. v. Diam USA, Inc.*, No. 06 C 4857, 2009 U.S. Dist. LEXIS 1648, at *7 (N.D. Ill. Jan. 9, 2009) ("It is a basic principle that the duty of the district court is to explain the law. Testimony by a witness, therefore is limited to opinions based on facts, but may not include legal conclusions"). While these issues are most often encountered when a party proffers a patent law

expert, it nonetheless remains the case that *no witness* can offer interpretation of the law. In sum, even the most "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759, n. 5 (7th Cir. 1999).

## IV. ARGUMENT

### A. Caulfield cannot rely on "general principles" without knowing how they apply in the relevant field of art.

General experience and review of scientific principles is not informative where an expert has no idea how those principles apply in the relevant field of art. Caulfield has previously attempted to offer opinions based on similar generic statements in other cases, and as recently as February 2013, he was barred from doing so. *See Neale v. Volvo Cars of N. Am., LLC*, Civ. A. No. 2:10-cv-4407 (DMC)(MF), 2013 U.S. Dist. LEXIS 28544 (D.N.J. Feb. 28, 2013), and Ex. 1 at Ex. A at 7 (identifying same case on *curriculum vitae*). In *Neale*, plaintiffs sought to exclude Caulfield's declaration because it was nearly entirely speculative and based on little work or research. Although defense counsel responded that Caulfield's opinions were supported by his years of experience and practical engineering knowledge, the court rejected those arguments, holding, "An expert's personal qualifications and past experience is not sufficient. Caulfield's admitted lack of preparation and sound methodology convinces this Court that his opinion is not supported by 'good grounds.'" *Neale*, 2013 U.S. Dist. LEXIS at *10.

Here, Caulfield's routine is similar. He seeks to criticize a testing mechanism, even though he has no idea if it is the standard in the field of art. He identifies purported issues, but either cannot quantify what effect they would have on testing or is unaware of how testing is

10

conducted according to standard protocols in the field. For example, on the issue of heat generated by frequency testing, Caulfield testifies:

> Q. Do you know for a fact that wear is frequency dependent in this situation?
>
> A. It will be if you have heat and dry.
>
> Q. Did you ever measure the heat generated by cycling these handles on this handle life test stand or any other handle life test stand?
>
> A. It's commonly accepted amongst engineers that friction generates heat. There's no place else for the energy to go. The faster you do it, unless you can dissipate the heat from the parts, they heat up.
>
> Q. But you never even measured a model of that heat generation in this situation, did you?
>
> A. Heat is going to be a factor depending on frequency.
>
> Q. But you never measured a model in this case, correct?
>
> A. That's correct. There are some things, in life, Counselor, you don't have to model. You learn in school

*Id.* at 111:1-20. He is also flat out wrong as to PSI. Such testimony is not relevant to this field of art and does not provide any sense of what effect, if any, his criticisms have on the actual results of the life cycle testing. He has not done any research to find out what standards he should be applying unique to this type of testing analysis. For these reasons, Caulfield's opinions based on "general scientific principles" as to the testing protocol should be rejected.

    **B.    Caulfield is not qualified to offer the opinions relating to life cycle testing.**

Caulfield's opinion regarding the sufficiency of life cycle testing is unreliable, not based on any specific knowledge or skill and thus is not of use to the fact-finder. As detailed above, Caulfield cannot quantify the effect his "criticisms" have on test results, even though he does concede, by reviewing the parts made available to him from the Zurn life cycle testing as well as data provided by Zurn relating to real world parts, that retainer wear does occur. *Id.* at 96:16-22 ("Q. I didn't hear you refer to any of your own independent testing? A. I didn't do any wear

11

testing. I look at valves that come from the field, particularly incorporating the Sanford ones. The Sanford valves are worn. I'll give you that."); 144:5-7 ("[N]umber one is, the retainers don't wear. I mean, that's been documented. They shouldn't wear. They won't wear out. They can exhibit a degree of wear."). Any opinions relating to life cycle testing by Caulfield are improper and should be excluded.

        **C.    Caulfield is not qualified to analyze the ramifications of reliance on life cycle testing in rendering a legal opinion of counsel.**

Caulfield is not a lawyer, and he admits he does not understand the willfulness standard. Yet, he repeatedly testifies regarding whether it is permissible to rely on the life cycle testing, and concludes that it is reckless (both objectively and subjectively) to do so. *Id.* at 33:4-17 ("And what I bring forward from there is the testing that was conducted by Zurn to try to get around the infringement issue was constructed and that to me – and I defined it in the last paragraphs – gets into the willfulness issue, objectively and subjectively. That Reznick should not have relied on that Zurn testing. Zurn should not have given that testing. That's misrepresentative of the Zurn product in the field to Reznick and that to me goes in that they constructed a test to try to get beyond infringement and to me that's willfulness. I am not a lawyer or a judge, but I think you see what I'm saying."). Without the relevant educational background or even experience upon which to base his testimony, Caulfield's testimony is not relevant. Accordingly, he has no basis to testify regarding what impact relying on the life cycle testing has on the opinion of counsel, or ultimately, any willfulness analysis.

        **D.    Caulfield's proposed testimony invades the province of the fact-finder as to whether reliance on the testing in the opinion of counsel is appropriate.**

Where an expert invades the province of the fact-finder by attempting to cloak conclusions of law as testimony, such testimony is not proper, and should be excluded. *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("[u]nless the expertise adds something, the expert at

best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403"); *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implication of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears").

Testimony regarding objective recklessness is entirely improper as that is a matter purely for the Court's determination. On the issue of subjective recklessness as well as the reasonableness of relying on lawyer advice (*see* Ex. 1 at ¶ 10), any opinion by Caulfield invades the province of the jury as fact-finder. *SDI v. CSC*, 09 C 4008, 2012 WL 329819, *3 (N.D. Ill. Aug 10, 2012) ("summarizing evidence that is favorable to [their party] to sort out possible conflicting testimony or to argue the implication of those inconsistencies" is not proper expert testimony); *Aponte v. City of Chicago*, No. 09-cv-8082, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011) ("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony."). Here, Caulfield provides no unique insight based on experience or practice. Rather, the report summarily opines that such evidence establishes the objective and subjective recklessness prongs of the willfulness analysis (based on false assumption and conclusory statements), and that any reliance on the opinion of counsel is not reasonable. Such testimony is improper and should be excluded.

      **E.**    **Caulfield's opinion includes unsubstantiated speculation.**

Speculative testimony is not admissible as expert analysis. *See Goldberg v. 401 North Wabash Venture, LLC*, No. 09 C 6455, 2013 WL 212912, at *2 (N.D. Ill. Jan. 18, 2013) (refusing to admit speculative testimony regarding what conclusions purchasers would or did draw from marketing materials and testimony regarding opposing party's alleged state of mind,

13

and concluding expert testimony unhelpful and unnecessary to the jurors). An expert is not permitted to act as a mind reader. *Se-Kure*, 2009 US Dist. LEXIS 1648, at *2 (barring testimony regarding intent of or truthfulness of witnesses). *See also DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998). In *DePaepe*, the Court held:

> With all respect to the district court, the whole point of *Daubert* is that experts can't "speculate." They need analytically sound bases for their opinions. District courts must be careful to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves. Syson lacked any scientific basis for an opinion about the motives of GM's designers. He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive. Because Syson did not participate in the deliberations leading to the design of the sun visor, he could not testify as a fact witness on the subject, either.

*Id. See also, e.g.*, *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004) ("a court is expected to reject "any subjective belief or speculation"") (citation omitted).

Where an expert is being called to offer credibility testimony, such testimony should be excluded because it infringes the jury's role as the exclusive finder of fact. *See In re Paine*, Case No. 06 C3173, 2010 U.S. Dist. LEXIS 16978, at *9 (N.D. Ill. Feb. 25, 2010) ("Whether or not the testimony of particular witnesses should be considered credible 'is generally not an appropriate subject matter for expert testimony'") (*citing U.S. v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999)). Experts may not offer opinions as to whether they believe, or disbelieve, the testimony of particular lay witnesses "because an expert cannot testify as to credibility issues." *Goodwin v. MTD Prods., Inc*., 232 F.3d 600, 609 (7th Cir. 2000) (allowing attorney argument but precluding expert witness testimony regarding believability of other witnesses' testimony). *See also, e.g.*, *Goldberg*, 2013 WL 212912 at *8 ("Assessing credibility is the exclusive province of the trier of fact") (citation omitted); *Johnson v. Wyeth LLC*, No. 10-c-2690, 2012 WL

14

1204081, at *3 (D. Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge or other state of mind"); *U.S. Gypsum Co. v. Lafarge N. Am., Inc.*, 670 F. Supp. 2d 768, 775 (N.D. Ill. 2009) ("testimony that does little more than tell the jury what result to reach is unhelpful and thus inadmissible, and testimony regarding intent—essentially an inference from other fact—is even more likely to be unhelpful to the trier of fact") (internal citation omitted and other citations omitted). In short, an expert is not entitled to offer unsupported speculations in an effort to discredit the testimony of other witnesses.

Here, Caulfield testifies, "I think that wear simulator was set up to defeat this patent which is willful infringement." Ex. 2 at 82:19-21. Not only is such testimony wholly improper from a legal conclusion standpoint, as discussed above, but also such testimony is not based on any evidence that the simulator testing was run for any reason other than to obtain the results made available during discovery. Caulfield concedes as much, stating, "I'll have to give you, I don't know if he intentionally did it or it is happening by accident…" *Id*. at 140:3-5. *See also id.* at 141:8-20 (indicating Caulfield has no knowledge of whether Funari modified the test stand in order to prepare data for the Reznick opinion) and 61:23-62:4 ("Q. Zurn didn't just make that stand for purposes of litigation or anything, right? That's their standard life cycle test stand; isn't that right? A*. I'll bet you – and I don't know this for a fact* but I bet it's a handle life cycle test.") (emphasis added). Caulfield's testimony on this point is nothing other than fiction, and should be excluded.

## V.     CONCLUSION

For all of these reasons, Defendants hereby move to exclude the opinions and testimony of Caulfield.

| | |
|---|---|
| Dated: June 10, 2013 | /s/ John W. McIlvaine |

                                                      John W. McIlvaine (*admitted Pro Hac Vice*)
Thomas C. Wolski (*admitted Pro Hac Vice*)
Cecilia R. Dickson (*admitted Pro Hac Vice*)
Steven M. Johnston (*admitted Pro Hac Vice*)
sloanvzurn@webblaw.com

**THE WEBB LAW FIRM, P.C.**
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815
Facsimile: (412) 471-4094

Nicole M. Murray
nicole.murray@quarles.com
John E. Conour
john.conour@quarles.com
**QUARLES & BRADY LLP**
300 N. LaSalle St., Suite 4000
Chicago, IL 60654
Telephone: (312) 715-5000
Facsimile: (312) 715-5155

David R. Cross
david.cross@quarles.com
Patrick J. Murphy
patrick.murphy@quarles.com
**QUARLES & BRADY LLP**
411 E. Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Telephone: (414) 277-5000
Facsimile: (414) 271-3552

**Attorney for Defendants, Zurn Industries, Inc. and Zurn Industries, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013, I served the DEFENDANTS' MEMORANDUM IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF EDWARD M. CAULFIELD on Plaintiff via electronic mail with a courtesy copy to the Court, which constitutes service under the Federal Rules of Civil Procedure.

>Jason A. Berta (6295888)
>Scott R. Kaspar (6284921)
>Lisa M. Noller (6229957)
>Daniel W. Werly (6301164)
>
>**FOLEY & LARDNER LLP**
>321 North Clark Street, Suite 2800
>Chicago, IL 60654-5313
>Telephone: 312.832.4500
>Facsimile: 312.832.4700
>
>Richard S. Florsheim (admitted *pro hac vice*)
>
>**FOLEY & LARDNER LLP**
>777 East Wisconsin Avenue
>Milwaukee, WI 53202-5306
>Telephone: 414.271.2400
>Facsimile: 414.297.4900
>
>/s/ John W. McIlvaine
>Attorney for Defendants, Zurn Industries, Inc. and Zurn Industries, LLC