# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SLOAN VALVE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 10-cv-00204 |
| v. | ) |
| | ) |
| ZURN INDUSTRIES, INC., and | ) |
| ZURN INDUSTRIES, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Zurn Industries, Inc. ("Zurn") has moved to exclude Sloan Valve Company's ("Sloan") witness Leone Flosi and other testimony based on his investigation. For the reasons discussed below, the Court denies Zurn's motion.

## BACKGROUND

This is a patent infringement case involving U.S. Patent No. 7,607,635, entitled "Flush Valve Handle Assembly Providing Dual Mode Operation" (the "'635 Patent"). The '635 Patent "relates to flush valves for use with plumbing fixtures such as toilets, and more specifically to improvements in the bushing of the actuating handle assembly that will provide for user-selectable, dual mode operation of the flush valve." ('635 Patent, col. 1, ll. 6-10.) The improvement is a mechanism that allows a user to select one of two flush volumes based on the direction of actuation of the handle: a full flush volume to evacuate solid waste from the bowl or a reduced flush volume to remove liquid waste.

**I.     Sloan's Compensatory Damages Expert**

Sloan filed this lawsuit against Zurn alleging infringement. During expert discovery, Sloan disclosed Richard Bero as its expert on the issue of compensatory damages. Sloan asked Mr. Bero to "determine damages in the form of a reasonable royalty and to quantify price erosion damages." (R. 620-3, 4/5/2013 Bero Rebuttal Report, p. 3.) Mr. Bero opined that Sloan is entitled to a per-unit royalty rate of $106 per Accused Product for a total of $7.8 million. Mr. Bero's reasonable royalty rate calculation includes the profits Sloan would have made on (1) the sale of the patented manual dual flush valve packages and handles; (2) the sale of collateral products (*i.e.*, replacement diaphragm kits, urinal valves, and faucets); and (3) additional profits Sloan would have made by increasing its prices without Zurn's presence in the market, which Bero calls the "price effect." (Bero Rep. at 47-50; Bero Rebuttal Rep. at 55-57.) The table below breaks down the amount that Bero attributes to each category in reaching his $141 price.

| Component | 2006 weighted profit | 2006-2012 weighted profit |
|---|---|---|
| Product profit | $35 | $28 |
| Collateral profit | $35 | $40 |
| Price effect | $71 | $92 |
| **Total** | **$141** | **$160** |
| Note: Any minor differences are due to rounding. | | |

(Bero Rebuttal Rep. at 57.)

In calculating his collateral goods profit, Mr. Bero relied on Sloan executives who testified that when customers purchase a MDF valve, they typically also purchase other bathroom items, such as replacement diaphragm kits, urinal valves, and faucets. (Bero Rep. at 25-31.) Bill Madison, Sloan's National Sales Manager, for example, testified that based on his

2

sales experience, Sloan sold one urinal valve for every three toilet valves, and one faucet for every five toilet valves. (R. 697-7, 4/30/13 Madison Dep. Tr. at 69:5-25.)

**II.      Quest's Investigation**

Sloan hired Leone Flosi of Quest Consultants Int'l Ltd. ("Quest") to perform an investigation of bathrooms containing either Sloan or Zurn manual dual flush valves and handles at Mr. Bero's direction. (R. 688-1, Flosi Rep. at 2.) Specifically, Sloan hired Mr. Flosi and Quest to "assist in estimating the ratio of collateral product sales relative to manual dual-flush flushometer valves." (Bero Rep. at 28.) Mr. Bero used this data to project and calculate the profits that Sloan allegedly lost on collateral sales of unpatented products.

Mr. Flosi worked for the Federal Bureau of Investigation for 27 years and held numerous positions including Supervisor of the Chicago field office and Supervisor of the Drug Section. Since 1996, Mr. Flosi has been Partner, General Counsel, and Executive Vice President of Quest, which is an international security consulting and investigations firm. (Flosi Rep. at 2.)

Quest began its investigation in this case with a list of approximately 200 sites that Sloan believed contained either a Sloan or Zurn manual dual flush valve or handle covered by the '635 Patent and installed between 2005 and 2012. (*Id*.) Sloan sales representatives had to compile this list based on their knowledge and records because Sloan sells its MDF valves to third-party distributors and does not have complete sales and installation records for all of its MDF valves. (R. 688-1, 2/14/13 Madison Dep. Tr. at 56:3-56:9.)

After he received the list, Mr. Flosi directed ten Quest investigators to visit the sites across the United States to attempt to gain access to each site. (Flosi Rep. at 2.) If they were able to access a site, Mr. Flosi instructed the Quest investigators to photograph plumbing fixtures in the men's, women's, and unisex bathrooms. (*Id.*) The Quest investigators used specially

3

purchased iPhone cameras and the 1st Photo Marker iPhone application that stamps each picture with GPS coordinates, the date, time, photograph identification number, and the photographer's region number. (*Id*.) Mr. Flosi instructed the inspectors to photograph the following fixtures in every bathroom to which they obtained access: toilet flush valves, toilet bowls, urinal flush valves, urinals, faucets, soap dispensers, and hand dryers. (*Id*.) Mr. Flosi also instructed his investigators to take photographs of the outside of the building, the outside of each bathroom door, and of the entire bathroom. (*Id*.) If a site had more than six bathrooms, Mr. Flosi instructed his investigators to take pictures of all of the plumbing fixtures in the first six available bathrooms. (*Id*.) Quest agents accessed 81 of the 200 sites. (*Id*.) In addition to the photographs, the Quest investigators completed an onsite log, which confirmed the date and time of the site visit, the name of the agent, the name of the site, the region and facility information, the identity and number of each type of bathroom, the number of each plumbing fixture in each bathroom, and the total number of photos taken for each site. (*Id*. at 3.) The investigation revealed that 58 of the 81 photographed sites contained a majority of toilets with Sloan MDF valves. (Bero Rep. at 29.)

## LEGAL STANDARD FOR *DAUBERT* MOTIONS

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion. . . ." *Id. See also Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).

4

Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See id.*; *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013); *see also Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Power Integrations*, 711 F.3d at 1373; *Pansier*, 576 F.3d at 737.

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate.'" *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)). *See also Stollings*, 725 F.3d at 765. "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire,* 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek*, Inc., 689 F.3d 802, 805 (7th Cir.

2012). *Daubert* emphasized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

## ANALYSIS

Zurn challenges Mr. Flosi and Quest's investigation on two grounds. First, Zurn contends that Mr. Flosi and his company conducted a "survey," despite the fact that neither he nor Mr. Bero are survey experts. Second, Zurn argues that Mr. Flosi's methodology in conducting his investigation was unscientific. The Court will address each argument in turn.

### I. The Quest Investigation and Mr. Flosi's Qualifications

Zurn seizes on Mr. Flosi's description of his investigation as a survey and contends that he is not qualified to conduct or opine on a survey. (Mot. at 5-9.) As Sloan correctly explains, Zurn's argument rests on an incorrect definition of the word "survey." As described above, Mr. Flosi oversaw an investigation of bathrooms in approximately 200 building sites, which Sloan believed contained either Sloan or Zurn manual dual flush valves. He directed his investigators to take photographs of the plumbing fixtures in the first six bathrooms of each site that they accessed. He also instructed his investigators to complete a written log that documented the number and type of plumbing fixtures that they observed and photographed. This investigation matches one of the more general definitions of the word survey: "a general view, examination, or description of someone or something." (http://www.oxforddictionaries.com/us/definition/american_english/survey?q=survey. (last visited Mar. 3, 2014.) The work that Mr. Flosi and Quest performed for Sloan was akin to "a general examination" of plumbing fixtures in bathrooms of buildings known to have purchased MDF valves. Given his background, Mr. Flosi is qualified to conduct and opine on the visual

6

and photographic inspection his company performed for Sloan.  In fact, Zurn even concedes that Mr. Flosi is an "expert investigator."  (Mot. at 6.)

Zurn's challenge to Mr. Flosi's qualifications is based on a definition of "survey" that does not apply to his work, but rather addresses "an investigation of the opinions or experience of a group of people, based on a series of questions." (http://www.oxforddictionaries.com/us/definition/american_english/survey?q=survey. (last visited Mar. 3, 2014.)  The cases that Zurn cites in support of its argument that Mr. Flosi is not a survey expert, all of which are not binding on this Court, address surveys that draw conclusions based on interviews of individuals.  *See Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 179 (D. N.J. 2008) (finding expert testimony inadmissible because expert drew conclusions from "executive interviews" that are in "direct contrast with the statements made by the interviewees"); *Dukes v. Wal-Mart*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) (preventing expert from relying on interviews conducted by defendant's attorneys); *Yapp v. Union Pac. R. Co.*, 301 F. Supp. 2d 1030, 1036 (E.D. Mo. 2004) (rejecting expert's attempt to rely on interviews that defense counsel selected and attended).  This is clearly not the type of survey that Mr. Flosi conducted.  Mr. Flosi and his investigators did not interview anyone and did not seek to elicit any opinions in the course of their investigation.  They merely took photographs of and documented the plumbing fixtures in as many bathrooms as they could.  Zurn's challenge to Mr. Flosi's qualifications, therefore, fails.

Zurn also argues that Mr. Bero is not a survey expert and, thus, cannot draw any conclusions based on Mr. Flosi's investigation.  (Mot. at 6-9.)  In its reply, Zurn asserts that its "motion presents a single, purely legal question: is the opinion testimony Bero offers based on the data he extrapolated from Quest's 'general study' admissible?"  (Reply at 2.)  Indeed, Zurn's

reply brief focuses not on Mr. Flosi, but on Mr. Bero's collateral sales calculation. Zurn's shifting challenge to Mr. Bero fails for two reasons. First, arguments raised for the first time in a reply brief are waived. *United States v. Kennedy,* 726 F.3d 968, 974 n.3 (7th Cir. 2013); *Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013). Second, the present motion is directed to Mr. Flosi and his investigation, not Mr. Bero. Zurn's *Daubert* motion seeking to exclude Mr. Bero is currently pending and a *Daubert* hearing is scheduled for March 11, 2014. Zurn should address its challenge to Mr. Bero's collateral sales calculation in that proceeding.

## II.    Mr. Flosi's Methodology

As with its argument regarding Mr. Flosi's qualifications, Zurn's challenge to Mr. Flosi's methodology is based, in part, on Zurn's incorrect "survey" argument. As described above, the primary case upon which Zurn relies, *Floorgraphics*, addresses a survey that consisted of interviews of 28 people. 546 F. Supp. at 162. The court in that case noted that the plaintiff tried to use the survey evidence "as a substitute for the direct testimony of individuals who had first-hand knowledge of the events at issue." *Id*. at 179. Moreover, the court in that case excluded the expert testimony because the conclusions the expert drew were in direct contrast with the statements made by the people he interviewed. *Id*. at 177. The "necessary safeguards" that Zurn applies to surveys originate from a case in which the court excluded an expert's questionnaire survey for being "nothing more than a compilation of hearsay." *Pittsburgh Press Club v. United States*, 579 F.3d 751, 755-58 (3rd Cir. 1958) (noting that surveys "since they involve hearsay, must be conducted with proper safeguards to insure accuracy and reliability"). Again, Zurn's argument is based on the incorrect premise that Mr. Flosi conducted interview surveys of individuals. Instead, the Quest investigators photographed plumbing fixtures in as many

8

bathrooms as they could. They did not interview anyone and there are no corresponding hearsay concerns.

Zurn's remaining contentions regarding Mr. Flosi's methodology are more appropriately addressed on cross-examination. Zurn argues that the following facts render Mr. Flosi's investigation unreliable: (1) the list of sites that Sloan provided to Mr. Flosi was not randomly generated but rather compiled by Sloan's sales representatives; (2) the sites that Mr. Flosi's investigators visited were not randomly selected; (3) the sites that Mr. Flosi's investigators visited were overwhelmingly publicly accessible buildings like schools and universities; and (4) Mr. Flosi's investigators did not inspect every bathroom at each site and did not ensure that the bathrooms they did inspect adequately represented the site. (Mot. at 11.)

As described above, Sloan's sales representatives compiled the list that Mr. Flosi used to conduct his investigation because Sloan and Zurn do not have complete sales and installation records of every site that purchased MDF valves. (Resp. at 8.) Zurn can explore its concerns about a selection bias regarding these sites during cross-examination. (R. 697-15, 9/13/12 email.) Further, Zurn has not identified any evidence that indicates that Sloan selectively chose the sites it provided to Mr. Flosi. Similarly, Zurn does not cite any evidence of selection bias on the part of the Quest investigators with respect to the sites to which they gained access. Rather, Zurn acknowledges that the Quest investigators tried to visit all 200 sites. (Mot. at 11.) Finally, Zurn does not identify any evidence that the Quest investigators inspected the six bathrooms per site in a haphazard manner or that their selection of these six bathrooms did not represent the site. (Mot. at 11.)

Zurn also contends that the investigation was not objective because Mr. Flosi's agents and many of the site managers knew the purpose of the inspections. (Mot. at 13.) Unlike a

9

consumer survey, however, where knowledge of the purpose of the survey can destroy the objectivity of the survey, the Quest study surveyed sites with photographic evidence. The mindset or opinions of the Quest agents and site personnel did not affect the investigation. Zurn does not suggest that the photographs are compromised in any way because the agents knew the purpose behind the inspections. Thus, the fact that Quest agents were told about the purpose of the investigation does not destroy the objectivity of the study.

Mr. Flosi's methodology in documenting the collateral products was sufficiently reliable. Mr. Flosi and his investigators attempted to inspect every building site that they knew contained MDF valves. In fact, the only subjective element of the inspection was the instruction to inspect only the first six available bathrooms. This limitation, however, goes to the weight of the evidence. The Seventh Circuit instructs, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). *See also LG Electronics U.S.A. v. Whirlpool Corp., 08 C 242, 2010 WL 3397358 (N.D. Ill. 2010)* ("it is well-established that criticisms of surveys used in litigation are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that it be excluded.") (internal quotations omitted). Mr. Flosi can testify regarding the validity of his investigation and Zurn is free to attack his methodology through vigorous cross-examination. *Daubert*, 509 U.S. at 596.[1]

---

[1] Sloan maintains that it does not intend to elicit any opinion testimony from Mr. Flosi at trial, and that he will only "describe the facts relating to and authenticating the photographs" of the plumbing fixtures. (Resp. at 2.)

## CONCLUSION

For the reasons discussed above, the Court denies Zurn's Motion to Exclude Leone Flosi and Testimony based on the Quest Study.

Dated: March 5, 2014                    ENTERED:

                                        AMY J. ST. EVE
                                        United States District Court Judge